UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
A. GENAO,

                                        Plaintiff,                              **MEMORANDUM
                                                                                A N D     ORDER**

                    -against-
                                                                                07 CV 3979 (CLP)

BLESSED SACRAMENT SCHOOL
*a/k/a Blessed Sacrament Elementary School*
*a/k/a Church of the Blessed Sacrament School*
and CHURCH OF THE BLESSED SACRAMENT
*a/k/a Blessed Sacrament Church*,

                                        Defendants.
-------------------------------------------------------------------X

On September 24, 2007, plaintiff Antonio Genao filed this action against Blessed

Sacrament School, also known as Blessed Elementary School, also known as Church of the

Blessed Sacrament School (the "School"), and the Church of the Blessed Sacrament, also known

as Blessed Sacrament Church (the "Church"), seeking back wages representing overtime

premiums, prejudgment interest, and liquidated damages, pursuant to the Fair Labor Standards

Act ("FLSA") and New York's Minimum Wage Law.  In his Complaint, plaintiff alleges that

defendant failed to pay him overtime compensation, as required by federal and state law, in

violation of the FLSA, 29 U.S.C. §§ 206(a), 207(a)(1), New York Labor Law § 652, and N.Y.

Comp. Codes R. & Regs. tit. 12, §§ 142-2.2-2.4.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 24, 2007,  plaintiff moved for summary judgment, asserting that defendant

owed him overtime pay for a period of one year under the FLSA, and for a period of six years under the New York State Labor Law. He argued that his overtime pay should have been calculated by taking his total pay for each week, divided by the total number of hours he worked, to calculate his regular rate. See 29 C.F.R. § 778.308. For all hours worked in excess of 40, he asserts that he would be entitled to one and one-half times this regular rate. Plaintiff seeks to be paid overtime based on a 60-hour work week during the school year, claiming that he worked 40 hours per week for the Church, plus 20 hours per week of overtime for the School.

Defendants resisted plaintiff's motion for summary judgment, contending that while plaintiff was working at the School, he was paid using a combination of hourly rate and piece rate authorized by the FLSA. See 29 C.F.R. §§ 778.418(a), 778.420. Defendants argued that plaintiff's assignments at the School were solitary jobs, such as cleaning a set number of rooms, and that they were limited in time to something that could be completed in no more than two hours per day. Defendants argued that using this assumption of two hours of work at the School per day, plaintiff was compensated for his work at a rate never less than one and one-half times the minimum wage; thus, defendants were in compliance with the overtime provisions of the FLSA.

On September 30, 2008, this Court[1] denied plaintiff's motion, finding that there were material issues of fact in dispute as to the nature of the pay arrangement between the parties, the number of hours worked by plaintiff at the School, and whether plaintiff is entitled to receive liquidated damages. In denying the plaintiff's motion, the Court found that there was no evidence that plaintiff was paid by the number of rooms he was asked to clean, or that he was

---

[1]On November 29, 2007, the parties consented to the jurisdiction of this Court.

paid on a "piece rate" basis. As to defendants' alternate claim that they nonetheless complied with the overtime regulations of the FLSA because plaintiff never worked more than two hours per day at the School, for which he received $152.50 per week, the Court found that there were disputed issues of fact as to the hours worked by plaintiff and the pay arrangement agreed to.

The Court also found that there were material issues of fact as to the type of damages plaintiff would be entitled to receive even if liability were established. In addition to seeking overtime, plaintiff also argued that he was entitled to an award of liquidated damages equal to the amount owed in unpaid minimum wages and unpaid overtime for the portion covered by the FLSA. 29 U.S.C. § 216(b). Specifically, plaintiff argued that defendants failed to act reasonably and in good faith and failed to take any steps to investigate whether plaintiff was receiving the overtime to which he was entitled. See Reich v. S. New Eng. Telecomm. Corp., 121 F.3d 58, 71 (2d Cir. 1997) (noting that "[l]iquidated damages under the FLSA are considered compensatory rather than punitive in nature"). The Court denied plaintiff's motion in this regard given that the evidence relating to defendants' good faith and reasonableness was in dispute and based largely on the testimony of various witnesses, whose credibility would need to be evaluated by the trier of fact.

A bench trial[2] was held before this Court on December 1, 2008. For the reasons set forth below, this Court finds in favor of plaintiff and awards compensatory damages in the amount of $22,376.82.

---

[2]Plaintiff did not request a jury in his original complaint, nor did either party at any time file a demand for a jury trial.

DISCUSSION

A.  Pretrial Stipulations

Prior to trial, the parties submitted various pre-trial submissions in which they stipulated to a number of items about which there is no dispute.  Specifically, there is no dispute that the defendant, Roman Catholic Church of the Blessed Sacrament, is a church located in Jackson Heights, New York and that the Church operates a school which is part of the same corporation as the Church.  (Jt. Pretrial Ord.[3] ¶ 6(c); Pl.'s 56.1 Stmnt ¶ 2; Defs.' 56.1 Stmnt[4] ¶ 2).  The parties agree that plaintiff was employed by the defendants for approximately 19 years until November 27, 2006.  (Jt. Pretrial Ord. ¶ 6(a)).  The parties also stipulate that for statute of limitations purposes, the relevant time periods are August 29, 2001 to November 27, 2006 for plaintiff's claim under New York law and from August 29, 2005 to November 27, 2006 for plaintiff's federal law claim.  (Id. ¶ 6(b)).  The parties also agree that plaintiff worked at least 40 hours per week for the Church.  (Jt. Pretrial Ord. ¶ 6(d); Pl.'s 56.1 Stmnt ¶ 3; Defs.' 56.1 Stmnt ¶ 3; Defs.' Pretrial Subm. ¶ 8(b)(v)).  During this time, plaintiff was paid $390 per week in 2001 for work performed in the church; $400 per week in 2002; $415 per week in 2003; $423.50 per week in 2004; $433.50 per week in 2005; and $439.50 per week in 2006.  (Jt. Pretrial Ord. ¶ 6(d); Defs.'

---

[3]Citations to "Jt. Pretrial Ord." refer to the Pretrial Order filed by the parties on November 24, 2008.  Citations to "Defs.' Pretrial Subm." refer to the Pretrial Submission filed by defendant on November 20, 2008.  Citations to "Pl.'s Pretrial Subm." refer to the Pretrial Submission filed by plaintiff, dated November 17, 2008.

[4]Citations to "Pl.'s 56.1 Stmnt" refer to the Statement of Material Facts submitted by plaintiff, dated December 24, 2007; citations to "Defs.' 56.1 Stmnt" refer to the Statement of Material Facts submitted by defendants, dated April 29, 2008.

4

Pretrial Subm. ¶ 8(b)(v)).

C.  Trial Testimony

In support of his claim for overtime, plaintiff Antonio Genao testified at trial on direct examination that he was employed by the School from 3:00 p.m. to 9:00 p.m., beginning in 1987 and continuing until November 29, 2008.  (Tr.[5] at 6).  On cross-examination, he clarified that testimony, indicating that when he was first hired in 1987, his hours were from 6:30 a.m. to 2:30 p.m.  (Id. at 7).  He would start work in the Church at 6:30 in the morning, preparing the mass, and lighting the candles.  (Id.)  When mass was over, he put out the candles and at 10:00 a.m., he would go to help out at the School.  (Id. at 8).  He testified that at the School, he would help clean until 9:00 p.m.  (Id. at 9).

When asked if there ever came a time that his duties or hours changed at the Church, plaintiff testified, "No.  We do the same way."  (Id. at 10).  Then, when asked if he ever worked at night when he worked for Monsignor Robert Pawson, the individual who hired him in 1987, plaintiff testified, "No, they never asked me to go to the school."  (Id. at 10-11).  When counsel attempted to clarify the testimony by asking if it would "be fair to say in 1987, you did not work in the school at night," plaintiff's response was, "Yeah, we do the same thing because the problem the supervisor there, they ask me to go to the school, yes."  (Id. at 11).

Plaintiff testified that there are two buildings, one called the old building and one the new building; the new building was the smaller of the two.  (Id. at 12).  He testified that he cleaned

---

[5]Citations to "Tr. at   " refer to the transcript of the trial proceedings before this Court on December 1, 2008.

the new building "every day, every night," even if school was not in session. (Id. at 13).  He

testified that he cleaned the school in the summer even when the school was closed.  (Id. at 13).

In response to the question whether he cleaned the school at night during that time period, he first

testified, "no, to four."  (Id.)  Then when the examiner stated: "no, I believe you testified that

you worked in the school from three p.m. to nine p.m.," he responded, "yes." (Id.)  Then when

asked if that was only when school was in session, his answer was "No, every day we do that,

every day."  (Id.)

He testified that his duties at the School were to clean and sweep the classrooms and

hallway, mop the floors, throw out the garbage, and change the lights, but not to perform any

plumbing or electrical repairs.  (Id. at 13-14).  He also cleaned the four bathrooms in the School,

"[e]very day, every day the same thing, every day."  (Id.)  He never cleaned in the old building.

(Id.)

He testified that when he arrived at 6:30 a.m., he would first open the church and prepare

it for mass.  (Id. at 16).  When mass was over, he would clean the church, finishing his work in

the church "about three o'clock."  (Id.)  He was given a one-hour lunch break.  (Id.)  At three

o'clock, he would clean the School, which consists of twelve classrooms and four bathrooms.

(Id. at 17).  He would stay at the School until about a quarter to nine.  (Id. at 18).  He testified

that he could not leave the School even to go home for dinner: "I stay there all night because I

can no [sic] leave the school open."  (Id.)  He denied ever inviting friends to see him while

working nor did he invite anyone to help him clean.  (Id.)

Monsignor Raymond W. Kutner testified that he became the pastor of the parish affiliated

with the Blessed Sacrament Church and School on June 15, 1991. (Id. at 29).  He further testified

6

that he has been an ordained priest for 44 years, in charge of overseeing the parish as chief financial officer. (Id.)  He explained that the School and Church are the same corporation but they have different employee identification numbers, two separate payrolls and separate bank accounts, both general and payroll accounts. (Id. at 21-22, 31).

According to the monsignor, he offered plaintiff the job of cleaning the School at night, a job which became effective January 2, 2001. (Id. at 30).  Prior to January 2001, plaintiff worked only for the Church, except on a limited basis when he would perform services in the School during the day, but nevertheless would be paid by the Church. (Id.)  When School was open, plaintiff worked five days per week in the afternoon or evening at the School. (Id. at 22).  The monsignor testified that he set the pay rate for plaintiff, both for the School and the Church. (Id. at 22-23).  Defendants submitted the Church's payroll summary for the years 2001 through 2006. (Defs.' Exs. A-D).

According to the monsignor, plaintiff's hours working in the Church were set by Monsignor Pawson, Monsignor Kutner's predecessor, and were from 6:30 a.m. to 2:30 p.m., Monday through Friday, with the exception of holidays, and these hours continued after Monsignor Kutner assumed his position in the parish. (Tr. at 31).  During that time, plaintiff was given a lunch hour. (Id.)  If he worked more than 40 hours a week in the Church, plaintiff was paid at the rate of time-and-a-half. (Id.)

According to the monsignor, in January 2001, plaintiff was responsible for opening the Church at 6:30 a.m. and preparing the Church for the celebration of mass which began at 7:00 a.m. (Id. at 31-32).  He would turn on the lights, set up the alter, chalices and wine, and take care of the church until the last mass ended around 9:30 a.m. (Id. at 32).  If there was a funeral mass,

7

he would set up for that mass; otherwise, he would go to help clean the school auditorium in preparation for the lunch hour. (Id.) He was also responsible for sweeping the Church and cleaning between the benches, as well as cleaning the lower church meeting rooms and chapel, all of which he would do after mass was over. (Id. at 32-33). He did not open the Church for mass on Saturday or Sunday. (Id. at 32).

According to the monsignor, the School is an elementary school, servicing Pre-K through eighth grade. (Id. at 33). There are two school buildings. (Id.) The new school has twelve classrooms, six on each floor, but only six are used.[6] (Id. at 34). According to the monsignor, from 2001 until 2006, when he was discharged, plaintiff worked in the School at night only while school was in session. (Id. at 35).

During plaintiff's unemployment insurance hearing, the monsignor testified that plaintiff worked approximately four hours per day for the School but that the work could possibly be done in less time. (Id. at 23). According to the monsignor's prior testimony, plaintiff worked two different jobs; he worked a full-time job for the Church, and then at approximately 3:30 p.m., plaintiff would clean the School on the days the School was in session. (Id.) He would work there approximately four hours. (Id.)

At trial, the monsignor testified that he never personally supervised plaintiff; his supervisor was Carlos Diaz. (Id. at 36). The monsignor further testified that he never personally

---

[6]According to Carlos Diaz, plaintiff's supervisor, if a classroom was not used during the day, it would just require vacuuming. (Tr. at 43). Diaz also testified that there are six bathrooms in the new school that must be cleaned every day. (Id.) There are also twelve classrooms, of which ten were in use in 2006. Classrooms that were used during the day had to be fully cleaned, but classrooms that were not used only had to be vacuumed. (Id.) There is no cafeteria in the school; the children eat lunch in the auditorium which is in the old school. (Id.)

dropped in at night to observe what plaintiff was doing but that it was Mr. Diaz's job to oversee the work of the men in the maintenance department. (Id. at 36). Therefore, the monsignor had no personal knowledge of the hours actually worked by plaintiff. (Id. at 37). The monsignor denied any intention to pay plaintiff at approximately the same pay rate for both jobs. (Id. at 24). Although he testified at the prior unemployment insurance hearing that "I think I paid him basically the same rate as his rate was for the Church," during the trial, the monsignor testified that at the time of the earlier hearing, he did not have the actual data before him to show what plaintiff was actually paid. (Id. at 25). Specifically, the monsignor testified that while plaintiff received an annual pay increase between 2 and 3 percent from the Church, plaintiff's pay rate from the School never increased. (Id. at 26). The monsignor also denied that at the time of plaintiff's termination, plaintiff was being paid the same hourly rate for both jobs. (Id. at 26). Instead, he testified that he believed the rate plaintiff was paid for his work at the School was $37.50 per day[7] and that this rate remained the same regardless of any increases he may have received for his work at the Church. (Id.)

Carlos Diaz was called to testify by defendant. He testified that had worked for the Church for the past 13 years, and became plaintiff's supervisor in 2001.[8] (Id. at 40). His job responsibilities include calling the plumber or electrician, if needed, supervising the work that is done, and making sure everything is running perfectly. (Id. at 40). According to Mr. Diaz,

---

[7]However, in the Joint Pretrial Order, defendant appears to concede that plaintiff was actually paid $30.50 a day. (Jt. Pretrial Ord. ¶ 6(e), Def.'s Pretrial Subm. ¶¶ 3(b), 8(b)(viii))).

[8]On cross-examination, Mr. Diaz testified that he started working for the Church and the School in 1996 and that plaintiff worked for both the Church and the School at that time. (Id. at 54).

plaintiff worked in maintenance, cleaning the new school. (Id.) He started at "3:30, three

o'clock, between 3:30 and 5:30, that's it." (Id. at 41). He also cleaned the Church in the

morning. (Id.)

During the time plaintiff was assigned to work in the School, he was assigned to work by

himself, but Mr. Diaz would come by because he only lived a block from the Church. (Id.) Mr.

Diaz testified that he left work at 5:30 p.m., but would check on the school "[l]ike every other

day." (Id. at 42). He testified that at night, he "used to pass by around 7:30, eight, 8:30, a few

times and [plaintiff] was never there 'cause I went inside the school to make sure that he was

doing his job and I didn't never [sic] see him." (Id. at 41). When Mr. Diaz stopped by, the

School would still be open. (Id.) When he later asked plaintiff where he was, plaintiff told him

that he had gone home or to get something to eat. (Id. at 42). Mr. Diaz testified that he never

saw anyone in the new school with plaintiff and that it was plaintiff's job to lock up. (Id. at 43-

44).

On cross-examination, Mr. Diaz testified that plaintiff worked approximately four hours

each evening. (Id. at 47). He conceded that on some days, if there was a party or something

going on, there might be a little more work to do but "it wasn't that much garbage." (Id. at 49).

According to Mr. Diaz, after plaintiff's employment ended in November 2006, another

individual, Luis, was hired to clean the new school. (Id. at 42). According to Mr. Diaz, Luis

takes three hours to clean the school. (Id.) Luis starts at 2:30 p.m. and "by 4:30, four o'clock,"

he is finished and locks up the school. (Id. at 49.) Mr. Diaz described plaintiff as an "okay" or

average employee, noting that sometimes there were complaints from teachers that their

classrooms had not been cleaned. (Id. at 51). Luis, on the other hand, is more efficient and there

10

are no complaints. (Id. at 51-52).

Plaintiff's counsel showed Mr. Diaz his previously submitted affidavit dated April 2008, which stated: "'Although the plaintiff should not have needed to work later than five p.m. usually and in any event no later than six p.m. on any occasion, I would frequently notice lights in the school building as late as eight p.m.'" (Id. at 54 (quoting Pl.'s Ex. 5)).

The monsignor was recalled to the stand and asked if the parish retained an accountant in 2001. (Id. at 56). According to the monsignor, the accountant, Paul Dennis, of the firm of Bauman, Dennis and Hopperly, formerly Bauman, Monaghan and Cibanes, was hired to review the work of the Church's bookkeeper, to perform the bank reconciliations, and to file the payroll tax returns for the employees. (Id. at 56). The monsignor testified that at no time did the accountant inform him that the parish was paying its employees incorrectly. (Id. at 57). On cross-examination, the monsignor admitted that he never directly asked the accountant: "I just presumed [h]e would - - he should know." (Id. at 58). He also testified that he believed that the Church and School were separate entities and he did not think that plaintiff's hours had to be aggregated or combined for purposes of overtime. (Id. at 58, 61). The monsignor conceded that now he understood that plaintiff should have been paid overtime for the combined hours worked at the Church and School: "Possibly for a couple of hours. He certainly did not work what is claimed that he worked, as far as hours, to my understanding." (Id. at 60).


B. Plaintiff's Entitlement to Overtime

The first issue is whether defendants failed to pay plaintiff the overtime that he was due for the work performed at the School, and if so, what amount is owed. Plaintiff claims that he

worked part time for the School during the six-year period alleged in the Complaint. (Jt. Pretrial Ord. ¶ 6(e)). He alleges that he was paid a per diem rate of $30.50 per day for the work he performed for the School. (Id.) Indeed, despite Monsignor Kutner's testimony at trial that he believed plaintiff was paid $37.50 per day (Tr. at 26), defendants concede that plaintiff was in fact paid $30.50 a day. (Defs.' Pretrial Subm. ¶¶ 3(b), 8(b)(viii))). The parties agree that in 2001, plaintiff worked for the School for 80 days over 16 weeks; in 2002, he worked 188 days over 40 weeks; in 2003, 184 days over 40 weeks; in 2004, 201 days over 40 weeks; in 2005, 195 days over 40 weeks; and in 2006, 154 days over 33 weeks. (Jt. Pretrial Ord. ¶ 6(e))). Plaintiff argues that even though defendants concede that the Church and the School are part of the same corporation, the hours plaintiff worked at the Church were never aggregated with the hours he worked at the School for purposes of computing overtime. (Pl.'s Mem.[9] at 3).

Defendants concede that under federal law, if a person is paid at a flat rate and works in excess of 40 hours per week, he is entitled to receive time-and-a-half. (Tr. at 63). Defendants take issue with plaintiff's claim that he worked 20 hours per week for the School. (Id. at 65-66). They argue that the statute requires overtime pay for hours worked, not hours paid, and that the Church's payroll records demonstrate that plaintiff was paid overtime whenever he worked in excess of 40 hours per week for the Church. (Id. at 63). Noting that plaintiff claims to have been present in the school building on the job from 3:00 p.m. until 9:00 p.m. in the evening, defendants contend that plaintiff was not always present in the school on the days he was assigned to be there and that he spent an indeterminate amount of time during this period not

---

[9]Citations to "Pl.'s Mem." refer to the Memorandum of Law submitted by plaintiff in support of his motion for summary judgment, dated December 24, 2007.

working in the school building. (Id. at 65.)

Under the FLSA, plaintiff is entitled to receive the federal minimum wage and overtime compensation during the period covered by this action, which the parties agree ran from August 29, 2005 to November 27, 2006.  (Jt. Pretrial Ord. ¶ 6(b)).  See 29 U.S.C. §§ 206(a)(1), 207(a)(1); see also Grochowski v. Phoenix Const., 318 F.3d 80, 87 (2d Cir. 2004).  The FLSA provides for payment of overtime at a rate of not less than one and one-half times the minimum wage for any hour worked in excess of forty hours per week.  See 29 U.S.C. §§ 207(a)(1), 216; see also Chao v. Gotham Registry, Inc., 514 F.3d 280, 285 (2d Cir. 2008).  A somewhat higher minimum rate is required by New York's Labor Law §§ 650 et seq.,[10] see N.Y. Comp. Codes R. & Regs. tit. 12, §§ 142-2.1, -3.1, and the overtime rate under state law is calculated at the rate of one and one-half times the employee's regular rate of pay for work performed in excess of 40 hours per week.  29 U.S.C. § 207(a)(1); N.Y. Comp. Codes R. & Regs. tit. 12, §§ 142-2.2, -3.2. Under the Code of Federal Regulations, any employee who works for two related entities is entitled to have his hours aggregated for purposes of computing overtime.  29 C.F.R. § 791.2.

1)  Hours Worked

---

[10]New York law also requires employers of manual laborers, such as plaintiff, to pay wages in a timely manner and no more than seven (7) days after the work is performed.  N.Y. Lab. Law § 191(1)(a).  Failure to comply with this law exposes the employer to criminal prosecution.  See People v. Vetri, 309 N.Y. 401, 406, 131 N.E.2d 568, 571 (1955); see also N.Y. Lab. Law § 195 (detailing employers' record keeping requirements).  In addition, under New York Labor Law, an employer is required to pay an additional hour of pay at minimum wage for each day that the employee works for more than ten hours ("spread of hours" wages).  See N.Y. Lab. Law §§ 650 et seq.; N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.4.  Since plaintiff has not requested spread of hours wages in his Complaint, the Court has not awarded any damages in such amount.

Although plaintiff is only seeking overtime pay for 4 hours per day for the time when school was in session (Pl.'s Mem. at 5), at trial, plaintiff testified that he worked 6 hours of overtime per day at the School, from 3:00 p.m. to 9:00 p.m. (Tr. at 6). He also testified that he cleaned the School every day even when School was not in session and that he worked in the School at night beginning in 1987. (Id. at 6-7). If believed, plaintiff's testimony would indicate that he required six hours to clean twelve classrooms, four bathrooms, and a lobby, assuming that he worked continuously from 3:00 p.m. until 9:00 p.m.[11]

The testimony of Monsignor Kutner and plaintiff's supervisor contradicts plaintiff's testimony in a number of respects. Monsignor Kutner testified that plaintiff only started cleaning at night in the School in 2001, at the Monsignor's request, testimony which the Court credits. (Id. at 30). He testified that only six to eight of the classrooms were in use starting in 2001. (Id. at 34). He also testified that plaintiff only cleaned the School when the school was in session. (Id. at 22). Indeed, plaintiff seems to have conceded that fact since he is only seeking overtime for the period when school was in session. (Pl.'s Pretrial Subm. ¶ 8(b)(v)).

As for the plaintiff's testimony that he spent six hours per day cleaning the School, even when the School was not in session, the Court does not find his testimony in that regard to be credible. First, plaintiff's pre-trial submission only seeks reimbursement for four hours of work per day at the School while it was in session, a claim based on Monsignor Kutner's testimony at

---

[11]Mr. Diaz testified there were six bathrooms in the School that would have to be cleaned everyday. (Tr. at 43). He also testified that only ten classrooms (of twelve total) were in use in 2006. (Id.)

the administrative hearing. (Pl.'s Ex. 1[12] at 20). However, the Court credits the testimony of Mr. Diaz who stated that plaintiff started between 3:00 to 3:30 p.m and should have completed the job by 5:00 p.m. or 6:00 p.m. at the latest, which at most would be a total of three hours work at the School. (Tr. at 40-41, 53-54). Mr. Diaz also testified that plaintiff's replacement, Luis, usually takes about three hours[13] to perform the same tasks as had been assigned to the plaintiff. (Id. at 42-43). Mr. Diaz further testified that on the occasions when he visited the School at 7:30 p.m. to check on the plaintiff, he would not be there. (Id. at 41, 48).

Having considered all the testimony of the various witnesses and reached the foregoing conclusions about the witnesses' credibility, the Court finds that on the days the parties agree plaintiff worked at the School, he worked there for three hours on average.

### 2) Overtime Wages Due

Under the FLSA regulations, an employee is to be compensated based on a regular rate calculated by dividing total compensation received by total hours worked. See 29 C.F.R. §§ 778.109, 778.308. Where an employee is paid at two different rates, the regular rate is generally a weighted average of the two, calculated simply by dividing total compensation by

---

[12]Pl.'s Ex. 1 refers to the transcript of the Hearing before Administrative Law Judge John Coffey on August 22, 2007. Monsignor Kutner testified at that hearing that the plaintiff would work "approximately four hours" cleaning the school when it was in session. (Pl.'s Ex. 1 at 20). At trial, however, Monsignor Kutner stated that "My testimony said four [hours]. What he actually did would be less." (Tr. at 23).

[13]Later on in his testimony, Mr. Diaz testified that the plaintiff's replacement generally works from 2:30 or 3:30 p.m. to 4:00 or 4:30 p.m., which would only be a total of two hours at most. (Id. at 49). In finding that plaintiff is entitled to be paid for three hours of time at the School, the Court has taken the greater number of hours testified to by Mr. Diaz.

total hours worked.  See 29 C.F.R. § 778.115.  In calculating damages here, Plaintiff has relied on this straightforward formula to calculate his overtime premium rate.

Specifically, plaintiff testified that he worked six hours per day at the School. Thus, he argues that he is entitled to wages based on 40 hours per week at the Church plus 20 hours per week (four hours per day) at the School.[14]  (Pl.'s Mem. at 4; Pl.'s Pretrial Subm. at 3).  He argues that for weeks during which he worked at the School, his pay should be determined by first calculating his regular rate by dividing his total weekly pay at both the Church and the School by 60 hours worked.  (Id. at 3 (citing 29 C.F.R. § 778.308)).  His pay should be supplemented, he contends, by adding an overtime premium of half the regular rate multiplied by the 20 hours worked in excess 40 hours.  (Pl.'s Mem. at 5; Pl.'s Pretrial Subm. Ex. 1[15]).  Using these figures, plaintiff seeks a total of $18,634.77, not including interest or liquidated damages.  (Id.)

Defendants, on the other hand, argue they were "free to pay a fixed rate for the hours worked by plaintiff provided that it did not violate the overtime pay requirement." (Defs.' Pretrial Subm. at ¶ 8(b)(xiii)).  They claim overtime may be paid at a fixed rate, citing 29 C.F.R. § 778.309.  (Id.)  Defendants contend that since plaintiff claims he worked 4 hours at the School per day, the $30.50 per diem rate plaintiff was paid for his work at the School should be viewed as an hourly rate of $7.63, based on 4 hours worked per day.  (See Tr. at 67).  They contend,

─────────────────────

[14]In the Exhibit Damages Chart provided by plaintiff (Pl.'s Pretrial Subm. Ex. 1), plaintiff calculates his average hourly wage by adding together his total wages from the Church and School and dividing that number by 60 hours worked.  Since plaintiff agreed in the Pretrial Order that he worked approximately 40 hours per week in the school (Jt. Pretrial Order ¶ (6)(d)), that would mean plaintiff has calculated his damages on the assumption that he worked 20 hours a week in the School while it was in session.

[15]Pl.'s Pretrial Subm. Ex. 1 refers to the Exhibit Damages Chart submitted by plaintiff on November 17, 2008.

however, that plaintiff only worked at the School for between 2.5 and 2.67 hours per day, but was paid for 4 hours per day. (Id.) This 4 hours of pay, therefore, was equal to at least the time-and-a-half that he was owed because 2.67 multiplied by 1.5 equals 4. (See id.; Defs.' Pretrial Subm. at 3-4 (citing 29 C.F.R. §§ 778.109, 778.309, 778.312)). Defendants further argue that even if plaintiff did work more than 2.67 hours per day, he would be owed at most a matter of 20 to 30 minutes per day of overtime pay for the 702 days when the School was open during the time period in question.[16] (Tr. at 68). Under this theory, the overtime premium owed to plaintiff would be $3.82 per hour (half the $7.63 hourly rate), which, when multiplied by 702 days, times 20 to 30 minutes per day, results in an amount ranging from $893.88 to $1,340.82. Based on defendants' theory, that would be the highest amount owed to plaintiff in overtime.

Defendants, however, fail to demonstrate why the formula set out in Section 778.109 of the C.F.R. should not apply here or to otherwise explain how their theory is supported by the FLSA. They cite three sections of the regulations implementing the FLSA—29 C.F.R. §§ 778.109, 778.309, and 778.312—none of which supports their method of calculating overtime. Section 778.109 simply specifies that statutory overtime is to be awarded based on hours "actually worked," with the regular hourly rate computed by dividing total weekly compensation by hours actually worked per week. Section 778.309 specifies that where an employee works a fixed number of overtime hours per week, "it is, of course, proper to pay him, in addition to his compensation for nonovertime hours, a fixed sum in any such week for his

---

[16]Defendants' counsel mentioned the "702 days" during closing arguments but it is not clear how that total was derived. (Tr. at 68). According to the Joint Pretrial Order, plaintiff worked a total of 1002 days at the School from August 29, 2001 to November 27, 2006. (Jt. Pretrial Ord. ¶ 6(e)). The 702 days may represent the time worked by plaintiff at the School up until August 29, 2005, when plaintiff's FLSA claim begins.

overtime work, determined by multiplying his overtime rate by the number of overtime hours regularly worked." 29 C.F.R. § 778.309.  However, when "an employer seeks to pay a non-exempt employee a weekly salary that includes a premium overtime component calculated at time and one-half of an hourly rate, there must be an express agreement to such an arrangement." Jacobsen v. Stop & Shop Supermarket Co., No. 02 CV 5915, 2003 WL 21136308, at *3 (S.D.N.Y. May 15, 2003) (internal citations omitted). There is no record of any such express agreement that plaintiff's compensation included overtime pay and the mere fact that an employee works a regular number of overtime hours does not in itself exempt an employer from calculating the applicable overtime rate under the formula specified in section 778.109.  Finally, Section 778.312 governs employees paid a "task rate." 29 C.F.R. § 778.312.  As is made clear in this section and in Section 778.313, however, even where an employee is paid at a task rate, the employer is still obliged to pay statutory overtime under the basic formula set out in Section 778.109, based on total pay and hours actually worked.

Assuming that plaintiff was paid at a rate of $7.63 per hour for his work at the School, as defendants apparently contend, plaintiff was paid at a lower rate for his work at the School than his work at the Church, which started at $9.75/hr in 2001 based on a 40-hour work week and rose to $10.99/hr in 2006.  (See Jt. Pretrial Ord. ¶ (6)(d)).  Defendants do not establish, however, why these rates are different.  Moreover, even if these pay rates were intended to be different, defendants have failed to suggest how these different pay rates, corresponding to slightly different jobs, translate into a pay arrangement which is permissible under the FLSA.  There is no indication whatsoever that there was any discussion between the parties of whether the agreed upon per diem rate was designed to include overtime pay.  Further, under Section 778.115, the

18

fact that an employee was paid at two different rates does not change the basic formula for calculating statutory overtime unless the employment arrangement fits into one of several exceptions, and defendants do not suggest that the arrangements in this case fit any of these exceptions.[17]

Since the Court has already determined that plaintiff worked three hours per day at the School, that would mean plaintiff worked 15 hours per week at the School.  In addition to the 40 hours a week that plaintiff worked at the Church, that would bring his total hours worked to 55 during those weeks he worked at both the Church and the School.  Using the formula set forth in 29 C.F.R. ¶ 778.109,[18] and dividing the total compensation received for both his time in the Church and time in the School by 55 hours total, the Court calculates his regular pay rate as follows:

**Calculation of Regular Rate for Weeks Plaintiff Worked at School[19]**

| Year | Weekly Wages for Church | Weekly Wages for School | Total Weekly Wages | Weekly Hours | Regular Rate (Total Wages/Total Hours) |
|------|-------------------------|-------------------------|--------------------|--------------|----------------------------------------|
| 2001 | $390.00 | $152.50 | $542.50 | 55 | $9.86 |

---

[17]Although the exception set out in Section 778.419 appears on its face to be potentially applicable, this exception is in fact a "narrow" one which applies only to employees compensated at different rates for "entirely different kinds of work" and "only pursuant to an agreement arrived at before the work is performed." Scott v. City of New York, 592 F. Supp. 2d 386, 405 (S.D.N.Y. 2008).

[18]Although only one year of plaintiff's overtime from August 29, 2005 though November 27, 2006 is covered by FLSA with the remaining periods covered by New York Labor Law, the methods for calculating overtime are the same. See discussion infra p. 20.

[19]The Weekly Wages for the Church and School have been stipulated to by the parties in the Joint Pretrial Order ¶ 6(d)-(e).

| 2002 | $400.00 | $152.50 | $552.50 | 55 | $10.05 |
| 2003 | $415.00 | $152.50 | $567.50 | 55 | $10.32 |
| 2004 | $423.50 | $152.50 | $576.00 | 55 | $10.47 |
| 2005 | $433.50 | $152.50 | $586.00 | 55 | $10.65 |
| 2006 | $439.50 | $152.50 | $592.00 | 55 | $10.76 |

D. Claims under New York Labor Law

New York Labor Law mirrors the FLSA in that it also requires overtime pay at 1.5 times the regular hourly rate for hours worked in excess of 40 hours in a week. See N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; see also Noble v. 93 University Place Corp., 303 F. Supp. 2d 365, 376 (S.D.N.Y. 2003). Since it has already been determined that plaintiff is entitled to recovery under the FLSA for the period covering August 29, 2005 to November 27, 2006, it is unnecessary to perform an analysis of plaintiff's state law claims covering the same time period, which would lead to double recovery. See Jin v. Pacific Buffet House, Inc., No. 06 CV 579, 2009 WL 2601995 at *7 n.3 (E.D.N.Y. Aug. 24, 2009) (holding that a court does not analyze New York Labor Law claims after finding FLSA liability for the same time period).

For the period covered by the New York Labor Law alone, August 29, 2001 to August 28, 2005, analysis is also unnecessary since the sections of the New York Labor Law "governing overtime and minimum wage compensation. . .do not diverge from the FLSA." Nichols v. Mahoney 608 F. Supp. 2d 526, 548 (S.D.N.Y. 2009) (citing Whalen v. J.P. Morgan Chase & Co., 569 F. Supp. 2d 327, 329-330 (W.D.N.Y.2008)). Since the Court has already found defendants liable under FLSA, defendants are also liable under the New York Labor Law for overtime wages during the period of August 29, 2001 to August 28, 2005. See New York Labor Law § 160; N.Y. Comp. Codes R. & Regs. tit. 12, §§ 138-2.2; 142-2.2.

Accordingly, the Court awards back overtime wages totaling $15,626.13 as follows:

20

## Calculation of Unpaid Overtime Wages[20]

| Year | Regular Rate | Overtime Premium Rate | Days Worked at School | Overtime Hours Per Day | Overtime Hours | Unpaid Wages |
|------|------|------|------|------|------|------|
| 2001 | $9.86 | $4.93 | 80 | 3 | 240 | $1,183.64 |
| 2002 | $10.05 | $5.02 | 188 | 3 | 564 | $2,832.82 |
| 2003 | $10.32 | $5.16 | 184 | 3 | 552 | $2,847.82 |
| 2004 | $10.47 | $5.24 | 201 | 3 | 603 | $3,157.53 |
| 2005 | $10.65 | $5.33 | 195 | 3 | 585 | $3,116.45 |
| 2006 | $10.76 | $5.38 | 154 | 3 | 462 | $2,486.40 |
| Total | | | 1002 | | | $15,626.13 |

E. Prejudgment Interest

The decision to award pre-judgment interest is "ordinarily left to the discretion of the district court." Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir. 1998). However, "[t]o the extent. . . that the damages awarded to the plaintiff represent compensation for lost [back] wages, 'it is ordinarily an abuse of discretion not to include pre-judgment interest.'" Gierlinger v. Gleason, 160 F.3d 858, 873-74 (2d Cir.1998) (quoting Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 145 (2d Cir.1993), cert. denied, 510 U.S. 1164 (1994)).

Plaintiff claims he is entitled to prejudgment interest at a rate of 9% on that part of his claim which is subject to state law pursuant to N.Y. C.P.L.R. §§ 5001, 5004. Thus for plaintiff's claims for overtime from August 29, 2001 to August 28, 2005, which are covered only under the New York Labor Law, this Court awards 9% interest as required by N.Y. C.P.L.R. §§ 5001, 5004.

However, for the one year period from August 29, 2005 through November 27, 2006 where liability exists under both the FLSA and New York Labor Law, it is more appropriate to

---

[20]The numbers listed in the "Days Worked at School" column comes from the Joint Pretrial Order, ¶ 6(e).

use the federal interest rate provided in 28 U.S.C. § 1961(a) for the claims covered by FLSA. See Cioffi v. New York Community Bank, 465 F. Supp. 2d 202, 222 (E.D.N.Y. 2006) (holding that ". . .[I]n cases where the judgment is based on violations of both state and federal law, it is common practice in the Second Circuit to apply the federal interest rate pursuant to 28 U.S.C. § 1961(a)."); see also Kuper v. Empire Blue Cross and Blue Shield, 99 CV 1190, 2003 WL 23350111 at *3-6 (S.D.N.Y. Dec. 18, 2003).[21]

Under 28 U.S.C. § 1961(a), courts are required to use the "weekly average 1-year constant maturity Treasury yield" to calculate interest.  However, in calculating pre-judgment interest here, this Court has used the average annual rate since most courts use the "average annual—not weekly—rate of return on one-year T-bills between the time the claim arises and the entry of judgment." Kuper v. Empire Blue Cross and Blue Shield 2003 WL 23350111 at *5.  The relevant time period for the plaintiff's FLSA claims is August 29, 2005 until November 27, 2006. (Jt. Pretrial Ord. ¶ (6)(b)).

Therefore, the Court awards $6,750.69 in prejudgment interest as calculated below.[22]

---

[21]However, some courts have held differently. "Prejudgment interest may be awarded on state claims pursuant to N.Y. C.P.L.R. § 5001 even where liability is also found under the FLSA." Heng Chan v. Sung Yue Tung Corp. 2007 WL 1373118 at *9 (S.D.N.Y. 2007) (citing Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 342 (S.D.N.Y. 2005)).

[22]Since plaintiff did not calculate compound interest in his Exhibit Damages Chart (submitted by plaintiff on November 17, 2008), the interest has not been compounded.

## Calculation of Prejudgment Interest[23]

| Year | Unpaid Wages | NY/Federal Interest Rate | Multiply by # of years to present | Total Interest | | |
|------|------|------|------|------|------|------|
| 2001 | $1,183.64 | 9% | 8 | $852.22 | | |
| 2002 | $2,832.82 | 9% | 7 | $1,784.68 | | |
| 2003 | $2,847.82 | 9% | 6 | $1,537.82 | | |
| 2004 | $3,157.53 | 9% | 5 | $1,420.89 | | |
| 1/1/05-8/28/05 | $1,558.23 | 9% | 4 | $560.96 | | |
| 8/29/05-12/31/05 | $1,558.23 | 3.62% | 4 | $225.63 | | |
| 2006 | $2,486.40 | 4.94% | 3 | $368.49 | | |
| Total | $15,626.13 | | | $6,750.69 | | |

E. Liquidated Damages

Plaintiff also claims liquidated damages on the time period which is covered by his FLSA claims, for wages owed after August 29, 2005.[24]  (Pl.'s Pretrial Subm. 8(b)(x)).  Plaintiff argues that defendants failed to diligently investigate the overtime issue.  Defendants contend that based on the monsignor's testimony, liquidated damages should not be assessed.  The monsignor

---

[23]The Federal Interest Rate comes from the 1-year constant maturity Treasury yield interest rates, which can be found at: http://www.federalreserve.gov/RELEASES/H15/data/Annual/H15_TCMNOM_Y1.txt. Since the record is not clear about how many days plaintiff worked at the School before and after August 29, 2005, when Plaintiff's FLSA claim begins, the Court has assigned half of the wages owed in 2005 to each period so that the state and federal interest rate will each apply to half the wages owed for that year.

[24]Liquidated damages are also available under the New York Labor Law, but have not been requested by plaintiff. Therefore, they have not been examined.  However, as is required under FLSA, the Court must find that the employer acted wilfully before awarding liquidated damages under the New York Labor Law.  See N.Y. Lab. Law § 198.  Since no wilfulness has been found, liquidated damages under the New York Labor Law would also not be awarded, even if they had been requested.

testified that the parish relied on the advice of an accounting firm to file the payroll tax returns for the employees, and he testified credibly that he presumed the accountants would know what the proper amount would be to pay plaintiff for overtime. He conceded that, knowing what he now knows, he would have paid plaintiff based on the combined hours in the Church and the School.

Plaintiff seeks liquidated damages for the entire period covered by the FLSA, contending that the "'employer bears the burden of proving good faith and reasonableness.'" (Pl.'s Mem. at 5 (quoting Herman v. R.S.R. Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999))); see also Reich v. S. New Eng. Telecomm. Corp., 121 F.3d 58, 71 (holding that "'double damages are the norm, single damages the exception'") (citations omitted). Plaintiff argues that defendants failed to act reasonably in that they failed to take any steps to investigate whether plaintiff was receiving the overtime to which he was entitled. Indeed, the monsignor testified that although he relied on the accountant, he did not specifically ask the accountant about plaintiff's overtime. Although double damages are typically mandatory, the Court finds that the employer has effectively rebutted the presumption in this case. 29 U.S.C. § 260. Not only does the Court credit the monsignor's testimony that he at worst mistakenly believed that the School and the Church were two separate employers, was not aware of the intricacies of the FLSA, and relied on the accountant to review the parish records, but the evidence also demonstrates that when plaintiff worked overtime for the Church, he was paid overtime in accordance with the rules. There is no evidence that the monsignor or the Church was routinely denying plaintiff overtime based on his work at the Church; indeed, the fact that plaintiff was paid overtime reinforces the defendants' position that the Church was acting in good faith. Given the minimal amount of overtime that

24

the Court has determined is owing, the Court finds that liquidated damages are not warranted here.

In conclusion, the plaintiff is awarded $15,626.13 in back wages as a result of defendants' failure to properly calculate his overtime wages, plus $6,750.69 in prejudgment interest for a total of $22,376.82. Judgment shall enter accordingly.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
September 30, 2009

Cheryl L. Pollak
United States Magistrate Judge

25